1
2
3
4
5
6
7
8                    **UNITED STATES DISTRICT COURT**

9                    **SOUTHERN DISTRICT OF CALIFORNIA**

10

11   REZA JAFARI and FIRST AMERICAN                 CASE NO. 12cv2982-LAB (RBB)
     TITLE INSURANCE COMPANY
12                                                  **ORDER GRANTING THIRD**
                                  Plaintiffs,       **PARTY DEFENDANT'S MOTION**
13              vs.                                 **TO DISMISS**

14
     FEDERAL DEPOSIT INSURANCE
15   CORPORATION, as Receiver for
     La Jolla Bank; et al.,
16
                                  Defendant.
17

18

19          This case first came to the Court in early August 2012, when Jafari applied for a

20   temporary restraining order to block the FDIC from foreclosing on a home he'd just bought

21   in Rancho Santa Fe.  The Court denied the application on August 22, for two reasons.  First,

22   Jafari's grievance with the FDIC hadn't been exhausted administratively.  Second, the Court

23   lacked the authority, anyway, to enjoin the FDIC's exercise of its statutory powers as a

24   receiver.  Jafari dismissed the case on August 30.

25          In the meantime, on August 27, First American Title Insurance paid the FDIC the

26   amount it claimed was due on the home loan, $3,649,067.10, so it would reconvey the deed

27   of trust, which it did.  Then, on October 18, Jafari's grievance with the FDIC was finally

28   resolved against him.  That cleared the way to file a fresh lawsuit against the FDIC,

essentially to recover the money First American paid to the FDIC.  Indeed, Jafari concedes that while he's a named Plaintiff in this case, "First American is controlling the litigation and has authority to resolve it."  (Doc. No. 20 at 2.)

Several months after this case had been filed, the FDIC filed a third party complaint against the seller of Jafari's home, Birger Greg Bacino, as well as the escrow company, Heritage Escrow.  Now before the Court is Heritage's motion to dismiss that complaint.  The crux of Heritage's motion is that it's an innocent middleman.  It handled an escrow for Bacino and Jafari and simply followed their instructions, and therefore can't be liable to the FDIC for any wrongdoing.

**I.      General Factual Background**

The essential facts of this case haven't changed.  Jafari bought a home from Bacino that was encumbered by liens, one of which was a $2,540,000 construction loan from La Jolla Bank.  The bank had previously failed, however, and the FDIC held the lien as receiver.  Because the outstanding liens totaled more than the value of the home, Jafari and Bacino agreed to a short sale, which the secured creditors had to bless.  Along those lines, on September 8, 2011 the FDIC and Bacino executed a release agreement—the FDIC calls it a "proposal letter," which shows how the parties spin its significance—in which, *subject to certain conditions*, the FDIC would reconvey the deed of trust for $135,000.

Those conditions turned out to be a sticking point.  After escrow closed and Heritage Escrow wired the FDIC $135,000 pursuant to the release agreement, the FDIC sent it back, claiming certain conditions in the release agreement hadn't been satisfied.  The FDIC's position doesn't seem to be in dispute.  Rather, Jafari's complaint against the FDIC rests on the argument that the unsatisfied  conditions "were unlawful, unenforceable, or not material and therefore did not provide a valid basis for excusing the FDIC's obligation of counter-performance, which was to reconvey the La Jolla Bank Deed of Trust."  (FAC ¶ 39.)

The contested conditions each relate to the fact that Bacino personally guaranteed the La Bank construction loan, and the FDIC didn't want to release its lien in a way that would prejudice its ongoing efforts to hold him accountable in ongoing bankruptcy

proceedings.    After all, "[t]he Proposal Letter discussed a release of collateral, not a reduction in the amount that was due under the ALB Loan." (ATPC ¶ 17.)  The conditions appear in a single paragraph in the release agreement:

> On or about December 31, 2009, ALB Properties, LLC filed a petition for relief under Chapter 7 of the United States Bankruptcy Code.  The FDIC-R has objected to the discharge sought by Mr. Bacino and litigation is ongoing concerning the FDIC-R's objection to discharge.  The FDIC-R is willing to consent to the release of collateral as outlined in this Letter so long as the Guarantor(s) acknowledge and agree that by consenting to the release of collateral, the FDIC-R is not forbearing in any way with respect to its remedies under the Loan Documents, and is not waiving or releasing any of its claims with respect to the Borrower or the Guarantor(s) under the Loan Documents.  Borrower and Guarantor(s) are willing to sign this Letter to assure the FDIC-R that they acknowledge and agree that the FDIC-R is not forbearing in any way with respect to its remedies under the Loan Documents, and not waiving or releasing any of its claims with respect to the Borrower or the Guarantor(s) under the Loan Documents.  Prior to effectuating the release of collateral referenced herein, Mr. Bacino acknowledges that he will be required to provide an opinion from his bankruptcy counsel, in a form satisfactory to the FDIC-R in its sole and absolute discretion, that the release of collateral contemplated by this letter and the continuing obligation of Mr. Bacino under his Guarantee do not require approval of the Bankruptcy Court and that the guarantee executed by Mr. Bacino will continue to be effective against him in the current bankruptcy court litigation and in any subsequent litigation derived therefrom.  ALB shall also provide an opinion from bankruptcy counsel, in a form satisfactory to the FDIC-R in its sole and absolute discretion, that the release of collateral contemplated by this letter and the continuing obligation of ALB under the Loan Documents do not require approval of the Bankruptcy Court and that the Loan Documents executed by ALB will continue to be effective against ALB in subsequent litigation.

As the FDIC puts the point in its complaint, "Each of the conditions discussed in the Proposal Letter were extraordinarily important to the FDIC-R because it had claims in the pending Adversary Action against Bacino concerning the personal guarantees he provided in connection with the ALB loan, as well as other loans, and it was always intended that these obligations would remain in place following any release of the lien on the Property." (ATPC ¶ 19.)

/ /

With the FDIC refusing to reconvey the deed of trust and threatening foreclosure, Jafari had no choice but to pay the FDIC the amount due on the loan.  Then he sued the FDIC to enforce the release agreement as he construes it.

## II.    The FDIC's Complaint Against Heritage

So what did *Heritage* do wrong?  In a nutshell, the FDIC alleges that Heritage—and, for that matter, First American—had the release agreement/proposal letter with the FDIC's

1  conditions and ignored it, releasing the collateral without first obtaining the FDIC's consent
2  or confirming that the critical conditions had been satisfied.  (ATPC ¶¶ 20–22, 26.)  In the
3  FDIC's words, "Bacino and Jafari submitted joint escrow instructions to Heritage which
4  required Heritage, among other things, to obtain the appropriate releases and approvals
5  from the FDIC-R to allow the Property to be sold free and clear of all liens and
6  encumbrances."  (ATPC ¶ 20.)  For example, a March 19, 2010 "Addendum" to the
7  "Residential Purchase Agreement and Joint Escrow Instructions" directed that "This
8  purchase agreement is subject to the approvals of seller, seller's attorney, seller's
9  bankruptcy trustee, bankruptcy court, and the lenders/lienholders  approval of short sale
10  (lenders Chevy Chase Bank and the successor of La Jolla Bank or the FDIC."  (Doc. No.
11  27-1.)

12        The FDIC's complaint asserts eights claims, but only five are directed at Heritage.
13  (The others are directed at Bacino.)  The first three claims are for breach of contract, breach
14  of fiduciary duty, and negligence.  The last two claims are for implied contractual indemnity
15  and declaratory relief.  Heritage's motion to dismiss challenges them all, its basic theory
16  being that Heritage simply did what it was told to by Bacino and Jafari, and owed no legal
17  duties to the FDIC.

18  **III.    Legal Standard**

19        A 12(b)(6) motion to dismiss for failure to state a claim challenges the legal sufficiency
20  of a complaint.  *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  The Court must accept
21  all factual allegations as true and construe them in the light most favorable to the FDIC.
22  *Cedars-Sinai Med. Ctr. v. Nat'l League of Postmasters of U.S.*, 497 F.3d 972, 975 (9th Cir.
23  2007).  To defeat Heritage's motion to dismiss, the FDIC's factual allegations needn't be
24  detailed, but they must be sufficient to "raise a right to relief above the speculative level . . . ."
25  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  That is, "some threshold of plausibility
26  must be crossed at the outset" before a case can go forward.  *Id.* at 558 (internal quotations
27  omitted).  A claim has "facial plausibility when the plaintiff pleads factual content that allows
28  the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.*

While the Court must draw all reasonable inferences in the FDIC's favor, it need not "necessarily assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003) (internal quotations omitted).  In fact, the Court does not need to accept any legal conclusions as true.  *Iqbal*, 556 U.S. at 678.  A complaint does not suffice "if it tenders naked assertions devoid of further factual enhancement."  *Id.* (internal quotations omitted).  Nor does it suffice if it contains a merely formulaic recitation of the elements of a cause of action. *Twombly*, 550 U.S. at 555.

**IV.    Discussion**

Heritage's motion to dismiss challenges the breach of fiduciary duty and negligence claims together, and separately challenges the breach of contract and implied contractual indemnity claims.  The Court's analysis will follow that outline.

**A.    Breach of Fiduciary Duty and Negligence**

Heritage has two arguments for the dismissal of the FDIC's breach of fiduciary duty and negligence claims.  The first argument is that the FDIC was neither a party to the escrow nor an  intended third party beneficiary of it, and was therefore not owed the duty of care that the claims require.  The second argument is that the FDIC hasn't suffered any damages, which is fatal to the claims.

/ /

**1.    Heritage's Duty of Care to the FDIC**

The FDIC can't accuse Heritage of breaching a fiduciary duty, or of negligence, unless Heritage owed the FDIC some duty of care.  Heritage first that because the FDIC didn't deposit any instructions or money with Heritage in connection with the escrow, it wasn't a party to the escrow and wasn't owed a duty of care.  Heritage relies heavily on two cases for this argument: *Summit Fin. Holding, Ltd. v. Continental Lawyers Title Co.*, 27 Cal.4th 705

(2002) and *Markowitz v. Fidelity Nat'l Title Co.*, 142 Cal.App.4th 508 (Cal. Ct. App. 2006).

*Summit* involved a home refinance.  The defendant in the case, Continental Lawyers Title Company, handled the escrow.  The original lender, to be paid off in the refinance, was Talbert Financial, but Talbert had previously assigned its rights to Summit, the plaintiff. Continental knew this.  It prepared a preliminary title report that showed the assignment. Nonetheless, pursuant to a payoff demand from Talbert and instructions from the company overseeing the refinance, Continental paid Talbert—and Summit never got paid.  Summit then sued Continental for negligence.  The court held that because Summit was a stranger to the escrow, it wasn't owed any duty of care by Continental.

The *Summit* opinion opens with the principle that "[a]n escrow holder is an agent and fiduciary of the parties to the escrow," and, for that reason, "an escrow holder must comply strictly with the instructions of the parties."  *Summit*, 27 Cal.4th at 711.  But, as the Court reads the opinion, it was critical in *Summit* that *both* Talbert and Summit were strangers to the escrow.  *Id.* at 708.  Indeed, it credited the Court of Appeal for distinguishing a case, *Builders' Control Serv. of N. Cal., Inc. v. N. Am. Title Guar. Co.*, 205 Cal.App.2d 68 (Cal. Ct. App. 1962) on the basis that "the principles it applied have no application to whether an escrow holder owes duties to a nonparty based on an assignment made by [one] stranger to the escrow to another [another] stranger to the escrow."  *Id.* at *713 (citation omitted). Here, by contrast, the question is whether an escrow holder owes a duty to a nonparty based on *the parties' own terms and instructions*.  On that question, the holding in *Summit* seems to leave an opening for liability to nonparties, as it quotes approvingly the Court of Appeal's statement that "*Builders' Control Service* stands for the proposition only that an agent's obligation to disburse proceeds held by the agent for its principal is coextensive with the principal's obligation to disburse those proceeds to the assignee."  *Id.* at 714 (citation omitted).  *See also Chen v. Dynasty Escrow, Inc.*, 2002 WL 1227478 at *10 (Cal. Ct. App. June 6, 2002).

This case is a bit different from *Summit* because Bacino and Jafari *were* parties to the escrow, and it is essentially their own terms and instructions that the FDIC accuses

Heritage of failing to carefully follow.  The addendum to the joint escrow instructions, dated March 19, 2010 and which Bacino and Jafari signed, indicated that the short sale required the FDIC's approval.  (Doc. No. 27-1.)  Likewise, the joint escrow instructions themselves, executed by Bacino and Jafari, indicated that the home would be transferred with monetary liens attached only if the buyer was assuming them.  (Doc. No. 27-1.)  This lends credibility to the FDIC's allegation that Bacino and Jafari's escrow instructions required Heritage to obtain the FDIC's approval of the short sale.[1]  (ATPC ¶ 20.)  The FDIC also alleges that Heritage had in its possession the release agreement/proposal letter with the conditions of the short sale, which it collected and which was also provided by Bacino.  (ATPC ¶¶ 21–22.) It's true that Bacino and Jafari instructed Heritage to send $135,000 to the FDIC[2], and that *Summit* limits an escrow company's duties to the parties' actual instructions, but that instruction doesn't complete the picture.  So, *Summit* may be distinguishable from this case.

On the other side are the cases the FDIC cites for imposing a duty of care on

---

[1] Heritage tries to argue that these instructions were rescinded when the escrow instructions were amended on April 14, 2010 and September 9, 2011.  (Reply. Br. at 6–7.) That is a stretch.  The April 14, 2010 "amendment" was actually titled "Supplemental Escrow Instructions," and it even acknowledged that "the purchase contract and these supplemental escrow instructions contain the entire agreement between Buyer and Seller."  (Uldall Decl., Ex. 2.)  The "purchase contract," however, is really just the "Residential Purchase Agreement and Joint Escrow Instructions" that were originally executed on March 19.  The addendum that specifically requires the FDIC's approval of the short sale even says, at the top, that it is "hereby incorporated in and made a part of the Residential Purchase Agreement."  (Doc. No. 27-1.)  Likewise, the September 9, 2011 "amendment" begins with the statement, from Bacino, "My previous instructions in the above numbered escrow are hereby modified – supplemented in the following particularly only."  (Uldall Decl., Ex. 1.)  The Court sees no evidence in the April 14, 2010 or September 9, 2011 documents that Bacino and Jafari intended for the March 19, 2010 joint escrow instructions and their addenda to be rescinded entirely.

[2] Heritage could do a better job of pointing directly to the evidence of this.  In its reply brief, it cites the so-called September 9, 2011 and April 14, 2010 "amendments" to the escrow instructions, but it doesn't point to the exact location of the directive to pay the FDIC $135,000.  (*See* Uldall Decl., Exs. 1, 2.)  The Court sees a line item for a $135,000 payment to Key Bank on the third page of the earlier document, and on the later document, executed at the same time as the release agreement, that amount is reduced to $118,000.  In its brief accompanying the motion to dismiss, Heritage claims that "the FDIC acknowledges that Mr. Bacino, a **party** to the Bacino-to-Jafari Escrow, instructed Heritage to pay the FDIC $135,000." (Mot. to Dismiss at 9.)  But it then cites to a number of allegations in the FDIC's complaint that don't say exactly that, for example, "The FDIC-R is informed and believes and on that basis alleges that, prior to the close of escrow, Bacino signed a copy of the Proposal Letter and provided it to Heritage."  (ATPC ¶ 22.)

Heritage.  They are *Plaza Home Mort., Inc. v. N. Am. Title Co., Inc.*, 184 Cal.App.4th 130 (Cal. Ct. App. 2010), and *Money Store Investment Corp. v. S. Cal. Bank*, 98 Cal.App.4th (Cal. Ct. App. 2002).  In both cases, lenders who submitted "closing instructions" to an escrow company, but weren't themselves parties to the escrow, were allowed to pursue claims against the escrow company when those instructions weren't followed.[3]  As the court in *Money Store* put it:

> Unlike the new lender in *Summit*, the Money Store had a direct contractual relationship with the [escrow company].  The contract specified what [it] was to do. [The parties to the escrow] authorized [the escrow company] to comply with those directives.  The Money Store's instructions were at least consistent with the [the parties'] original instructions . . . .
>
> Under these circumstances, the [escrow company's] action—if true as alleged—was morally blameworthy.  It was foreseeable the funds would be distributed contrary to the Money Store's instructions.  And, there was a close connection between the Bank's action and the harm suffered.  *Money Store*, 98 Cal.App.4th at 731.

Heritage argues that the cases are inapplicable because the lenders "funded the subject transactions and provided instructions directly to escrow," while the FDIC "did not fund the Bacino-to-Jafari escrow" and "did not submit any instructions to Heritage in connection with the escrow."  (Reply Br. at 8.)

That's true, descriptively.  This facts of this case are perched somewhere between those of *Summit*, in which the agreement the escrow company ignored was between two non-parties to the escrow and not formally incorporated into the actual escrow instructions, and *Plaza Home* and *Money Store*, in which the aggrieved parties weren't parties to the escrow but submitted specific instructions to the escrow company.  This case would be on all fours, or close to it, with *Plaza Home* and *Money Store* if the FDIC had *itself* transmitted its conditions for the short sale to Heritage.

---

[3] It's worth noting that in both cases the plaintiff lenders asserted claims for breach of contract, negligence, and equitable indemnity.  *Plaza Home*, 184 Cal.App.4th at 134 n.4; *Money Store*, 98 Cal.App.4th at 727.  In *Plaza Home* the lender abandoned its negligence and equitable indemnity claims, and the court's ruling pertained only to a breach of contract claim.  *Plaza Home*, 184 Cal.App.4th at 134 n.4.  In *Money Store*, the court addressed the lender's negligence claim, but relied on a discussion in *Summit* that addressed a statutory duty of care under Cal. Civ. Code § 1714, which the FDIC doesn't raise in this case.

1   With reasons to distinguish both *Summit*, and *Plaza Home* and *Money Store*, from the

2   facts of this case, the Court turns to *Markowitz*.  For Heritage, *Markowitz* is really *the case*

3   establishing that it owed no duty of care to the FDIC.  The facts are as follows.  Markowitz

4   obtained a $200,000 line of credit from City National Bank, secured by a second deed of

5   trust on his home.  But as a condition to the line of credit, the current holder of the second

6   deed of trust, the Kachlons, had to be paid off with the proceeds of the line of credit and their

7   deed reconveyed to City National.  City National retained Fidelity as the escrow company,

8   and when the Kachlons delivered to Fidelity their payoff demand, an executed request for

9   reconveyance, and their original promissory note and deed of trust, Fidelity issued them a

10   check.  Around this same time, City National sent a letter to Fidelity instructing it to record

11   the Kachlons' reconveyance and its new deed of trust.  Fidelity failed to do this, which

12   enabled the Kachlons to later initiate foreclosure proceedings against Markowitz.

13   Following the same lead principles articulated in *Summit*, the court held that while

14   Markowitz had an interest in the escrow, he was not a party to it and had no meaningful

15   contact with Fidelity—and therefore couldn't sue Fidelity on a breach of fiduciary duty or

16   negligence theory:

17   The defect in Donald [Markowitz's] argument, however, is that
    he was not a party to the escrow instructions on which he relies.
18   Fidelity's duties arising out of those instructions were defined,
    and limited, by the terms of those instructions.  Donald points
19   only to written instructions given to Fidelity by the Bank; he does
    not allege that he gave Fidelity any written or oral instructions
20   regarding carrying out the escrow.  As we shall explain, the duty
    arising from the instruction authorizing recordation of the Bank's
21   deed of trust "showing . . . in the second trust deed position" was
    owed to the Bank, not to Donald.
22

23   *Markowitz* is certainly significant, and a bad case for the FDIC, insofar as it recognized that

24   just because a party is injured by an escrow holder's failure to follow instructions doesn't

25   mean it can bring a cause of action.  Heritage is right to summarize the case as holding that

26   escrow holders don't owe duties of care to non-parties "even when: the escrow holder

27   breached the instructions given by the actual parties; the non-party had a significant financial

28   stake in the transaction; and the non-party was damaged by the escrow holder's breach of

the parties' instructions."  (Mot. to Dismiss at 8.)  And, Heritage has a point in comparing

Bacino and Jafari's instructions to Heritage in this case to City National's instructions to Fidelity in *Markowitz* to: The FDIC, like Markowitz, was an outsider who didn't stand in any relationship with the escrow holder.

But there are still reasons to distinguish the case.  First, as the FDIC points out in its opposition brief, the case went all the way to trial, where the court granted Fidelity's motion for a nonsuit.  That cuts against dismissing a claim at the motion to dismiss phase, as Heritage is attempting here.  Second, it was significant to the court in *Markowitz* that "the language of the instructions did not expressly evince an intent to benefit [Markowitz]."  *Markowitz*, 142 Cal.App.4th at 527.  That's true.  City National mentioned Markowitz in its letter to Fidelity, so Fidelity presumably was on notice that he was the homeowner.  But as the court recognized, the escrow was opened for City National's benefit, and Fidelity "had no reason to know or expect that Donald was looking to Fidelity for protection as to facts learned by it."  *Id.* at 528.  In this case, by contrast, the escrow instructions—specifically the addendum signed on March 19, 2010—indicated that the purchase agreement was subject to the FDIC's approval.  Third, in *Markowitz*, "[t]here were no instructions submitted by him, or to which he was a signatory, with which Fidelity was obligated to comply, or which it was obligated to carry out with reasonable care in the exercise of ordinary skill and diligence."  *Id.*  Again, there is a difference in this case.  The FDIC alleges that Heritage had the release agreement/proposal letter in its possession, to which the FDIC *was* a signatory and which may have given Heritage reason to believe the FDIC was "relying on it for protection."  *Id.*  Of course, some of these principles may also have commanded a different result in *Summit*, in which an escrow company knew that a party it paid had assigned its rights to another party.

Having considered the parties briefs and the relevant caselaw, the Court concludes that Heritage ultimately has the better argument here.  It's true that an escrow holder must follow the parties' instructions, and that the instructions in this case (along with the release agreement) indicated that the FDIC would only accept $135,000 to reconvey the deed of trust on Bacino's home if certain conditions were met.  At the same time, the latest set of

1    instructions Heritage received, from Bacino on September 9, 2011, indicated that it was

2    "authorized and instructed to debit the Buyer's account" for $135,000 for the FDIC.  (Uldall

3    Decl., Ex. 1.)  Heritage can't be expected to resolve any apparent inconsistencies between

4    the parties' instructions and the interests of an outside party.  *See TSF 53419, LLC v.*

5    *Fidelity Nat'l Title Ins. Co.*, 2013 WL 1750981 at (Cal. Ct. App. Apr. 24, 2013) ("Fidelity was

6    faced with an ostensible conflict between the escrow instructions of the parties to the escrow

7    on the one hand, and a claim by a third party, on the other.  By faithfully following the

8    instructions of the parties to the escrow, Fidelity satisfied its obligations as an escrow holder

9    and cannot be liable to third parties, such as TSF, for doing so.").  The court in *TSF* explicitly

10   held that mere knowledge of a third party's interest in an escrow or objection to the parties'

11   instructions doesn't give rise to a duty of care.  *Id.*

12          Also, even the cases the FDIC cites are easily distinguishable, because the interested

13   party in those cases (the lenders) had submitted instructions to the escrow company such

14   that they could be considered parties to the escrow.   Even if the cases Heritage

15   cites—*Summit* and *Markowitz*—are also distinguishable on various small points, as the Court

16   has shown, the overarching message in those cases is that an escrow holder owes a duty

17   of care only to actual parties to the escrow, not third parties with an interest in the escrow.

18   Moreover, only parties that actually submit instructions to escrow can rightfully be considered

19   parties to it.  *See Logan v. Chicago Title Ins. Co.*, 2013 WL 1080300 at *3 (Cal. Ct. App.

20   Mar. 15, 2013) ("Here, of course, Southstar was not a stranger to the escrow, but submitted

21   instructions to escrow and was a party to the escrow . . . .").  The FDIC argues that "an

22   obligation was owed to the FDIC based on the terms of the JEI and the Proposal Letter, and

23   the that the FDIC was therefore a party to the escrow."  (Opp'n Br. at 21.)  But it offers no

24   support for the proposition that an entity is a party to an escrow simply because the escrow

25   holder knows that it exists and has an interest in the escrow proceeds.  The Court is given

26   some pause by the statement quoted approvingly in *Summit* that "an agent's obligation to

27   disburse proceeds held by the agent for its principal is coextensive with the principal's

28   obligation to disburse those proceeds to the assignee," but that's seemingly at odds with

1   another statement in *Summit*, itself often quoted, that an escrow holder "has no general duty

2   to police the affairs of its depositors; rather, an escrow holder's obligations are limited to

3   faithful compliance with the depositors instructions."   *Summit*, 27 Cal.4th at 711 (internal

4   quotations and citation omitted).

5        The Court would see this case very differently if the FDIC reached out to Heritage to

6   insist that it be consulted before releasing its lien for a $135,000 payout.  Then, this case

7   would be in line with *Plaza Home*, *Money Store*, and others, for example *Am. Diversified*

8   *Props., Inc. v. Valleywide Escrow, Inc.*, 2008 WL 4060942 (Cal. Ct. App. Sept. 3, 2008).  In

9   this latter case, two real estate brokers agreed to split the commissions in a property deal,

10  and after a dispute arose between them the aggrieved broker informed the escrow company

11  of it and insisted that it hold all commissions.  The escrow company paid the commissions

12  anyway, before the dispute was resolved.  The court held that the aggrieved broker could

13  pursue a claim against the escrow company, but only because it had the right to issue

14  instructions to the escrow holder and actually did so:

15          We do *not* find that, as a general matter, a broker has standing
            to assert that the escrow holder has failed to follow instructions
16          and thus breached its contract with its principals, the seller and
            buyer.  We confine our holding to the conclusion that, for the
17          purposes of testing the legal sufficiency of the complaint on a
            demurrer, ADP's interpretation is reasonable that the purchase
18          agreement and the escrow instructions gave the brokers the
            right to issue instructions to respondent regarding the
19          disbursement of brokerage fees.  *Id.* at *4.

20  The FDIC's rebuttal, of course, is that Heritage *did* have instructions from it in the form of the

21  release agreement/proposal letter, but it's a stretch to call those instructions from the FDIC

22  to Heritage, or some kind of agreement that bound Heritage to the FDIC.  The FDIC's own

23  allegations are that Heritage "collected" the proposal letter, and also that Bacino provided

24  Heritage with a copy.  (ATPC ¶¶ 21–22.)  There is no allegation that the FDIC gave any

25  instructions to Heritage such that Heritage "had . . . reason to know or expect that [the FDIC]

26

27

28

12cv1971

was looking to [Heritage] for protection as to facts learned by it."[4]   *Markowitz*, 142 Cal.App.4th at 231.  In fact, in *First AFG Financial Corp. v. Security Union Title Ins. Co.*, the court held that "payoff demand" letters from a lender that were in an escrow company's possession, but that weren't addressed to it, didn't bind the escrow company in any way.  2010 WL 4975501 at *7 (Cal. Ct. App. Dec. 8, 2010).  Similarly in this case, the FDIC's proposal letter was addressed *to Bacino* and offered terms *to Bacino* for the release of the FDIC's lien.  Just because it was in Heritage's hands doesn't mean it can be construed as instructions from the FDIC to Heritage.

For all of the above reasons, the Court finds that Heritage owed the FDIC no duty of care on the facts alleged, and that the FDIC's breach of fiduciary duty and negligence claims therefore fail.  To the extent the Court's finding turns on the FDIC not being a party to the escrow, it wouldn't reach a different finding on the theory that the FDIC was an explicit and intended third party beneficiary of the Bacino-Jafari escrow.  *See Markowitz*, 142 Cal.App.4th at 527; *Gateway Bank v. Ticor Title Co. of Cal.*, 2009 WL 4190455 at *15–17 (Cal. Ct. App. 2009).  Admittedly, to a certain extent the analysis above traverses both theories without clearly distinguishing between them, but so does the caselaw and the parties' respective briefs.   The Court should also note that in *Money Store*, the FDIC's own case, the court allowed a breach of contract claim but recognized that a related tort claim was legally duplicative: "As alleged, the Money Store's cause of action for negligence would be subject to summary adjudication because it does not state a negligence cause of action apart from its contract cause of action."  *Money Store*, 98 Cal.App.4th at 732.  That is yet another problem with the FDIC's tort claims for breach of fiduciary duty and negligence.

## B.     Breach of Contract

This brings the Court to the FDIC's claim for breach of contract.  The essence of this claim is that the FDIC was an intended beneficiary of the sale of Bacino's home—and an intended beneficiary in particular of the proposal letter and joint escrow instructions—and

---

[4] The FDIC insists in its opposition brief that it is entitled to discovery on this issue, but the FDIC can't possibly need discovery to determine whether it, the FDIC, contacted Heritage to flag the conditions in the proposal letter.  (Opp'n Br. at 12, 19 n.38.)

1   that Heritage breached these "contracts" by disbursing to the FDIC $135,000 without
2   checking with it first to make sure the amount was right and the FDIC's conditions for
3   accepting that amount were satisfied.  (ATPC ¶¶ 42–43.)

4          From the FDIC's perspective, this is really where *Plaza Home* and *Money Store* have
5   traction, even though it also relied on those cases to argue that Heritage owed it a duty of
6   care and could be liable for breach of fiduciary duty and negligence.  The problem for the
7   FDIC is that the cases are easily distinguishable on the facts from this one.

8          A number of things happened in *Money Store* that the FDIC hasn't alleged—and likely
9   can't allege—happened in this case.  First, the escrow instructions specifically authorized
10  the escrow holder to comply with the plaintiff lender's own instructions.  *Money Store*, 98
11  Cal.App.4th at 726.   Second, as the Court has already explained, the lender actually
12  submitted closing instructions to the escrow holder.  *Id.*  Third, the escrow holder formally
13  acknowledged that it had received the lender's instructions.  *Id.*  Each of these facts informed
14  the court's decision that the lender had a potential breach of contract claim.  For example,
15  the lender's instructions, and the escrow's holder's acknowledged receipt of them, potentially
16  established the essential element of mutual consent:

17              The Money Store agreed to provide the loan funds to the Bank
                to facilitate the sale, which was the subject of the escrow, on
18              condition the money would be distributed in a certain manner
                and the Money Store would be notified before any changes were
19              made to the escrow instructions.   The Bank acknowledged
                acceptance of the conditions when its employee signed the
20              acknowledgment and acceptance.  *Id.* at 728.

21  These same facts also potentially established the essential element of consideration.

22              In return for the Bank's promises to disburse the funds as the
                Money Store designated, not to deviate from the Money Store's
23              instructions except at its own risk, and to provide an estimated
                closing statement for the Money Store's review and approval,
24              the Money Store deposited the loan funds with the Bank.  This
                was adequate consideration.  *Id.* at 729.
25
26  The FDIC can't allege facts close to these.

27          By its own account, the instructions in the joint escrow instructions to obtain the
28  FDIC's approval came from Bacino and Jafari, not from the FDIC: "The FDIC-R is further
    informed and believes that Bacino and Jafari submitted joint escrow instructions to Heritage

which required Heritage, among things, to obtain the appropriate releases and approvals from the FDIC-R to allow the Property to be sold free and clear of all liens and encumbrances." (ATPC ¶ 20.) And while the FDIC was a party to the release agreement/proposal letter, there is no allegation that the FDIC provided it to Heritage, to be clear that its receipt of $135,000 was conditional. To the contrary, the allegation is that Heritage "collected" the document, and that Bacino provided it to Heritage. (ATPC ¶¶ 21–22.) Absent the allegation of any meaningful content between the FDIC and Heritage, it is hard to see how the joint escrow instructions and proposal letter could give rise to the kind of mutual consent and consideration that the court found potentially existed in *Money Store.* Indeed, there is a fundamental disconnect between the FDIC's argument that it was a third-party beneficiary of the Bacino-Jafari escrow and its reliance on *Money Store*, which isn't a third-party beneficiary case. The plaintiff lender's argument in *Money Store* wasn't that it was the intended beneficiary of the escrow, but that it had reached out directly to the escrow holder and entered into a contractual relationship with it.

*Plaza Home* is as easy to distinguish as *Money Store*. The case involved the sale of a home; Plaza Home was the lender and North American Title was the escrow company. Plaza Home submitted closing instructions to North American, which the parties agreed constituted a contract. *Plaza Home*, 184 Cal.App.4th at 133. Not only were those instructions received by North American, they were signed by a North American representative. *Id.* at 137. The instructions laid out the terms of Plaza's loan, and they were very clear that all fees paid out had to be disclosed on a standard HUD-1 form prepared by North American for Plaza:

> [T]he closing instructions at issue here set forth the terms and conditions of closing the loans funded by Plaza, and set out the duties and responsibilities of the settling agent, North American, in connection with that closing. The closing instructions required North American to ensure that the loan documents were signed by the borrower and returned to Plaza before disbursement of the loan proceeds, and to disclose the fees and costs of the loans (e.g., broker, processing and other administrative fees), any payments outside of, or credits in connection with, the loans, and details of the loans themselves . . . . *Id.* at 136.

1    In this case, again, the FDIC doesn't allege that it provided any closing instructions to directly

2    to Heritage that are identical to the closing instructions provided by the lender in *Plaza*

3    *Home*. Instead, it tries to argue that the joint escrow instructions (which appear to have been

4    executed by Bacino and Jafari only), and the release agreement/proposal letter were their

5    functional equivalent—and amounted to a contract between the FDIC and Heritage. That

6    is too much of a stretch. Even *Plaza Home* recognized the difference between "escrow

7    instructions, which constitute an agreement between the escrow company, on the one hand,

8    and the buyer and seller, on the other hand," and actual closing instructions, which "set forth

9    the terms and conditions of closing the loans . . . and set out the duties and responsibilities

10   of the settling agent . . . in connection with that closing." *Id.* at 136. The FDIC wants to

11   elevate the escrow instructions from Bacino and Jafari into closing instructions from the

12   FDIC, and the *Plaza Home* opinion couldn't be more clear that they are legally distinctive.

13          Likewise, the FDIC tries to argue that "Heritage's acceptance of the Proposal Letter

14   obligated it to ensure that it was accurate and that the conditions precedent had been

15   satisfied," but that runs into the same problem. (Opp'n Br. at 19.) As the Court has

16   repeatedly observed, the proposal letter, even according to the FDIC, was never presented

17   to Heritage by the FDIC in such a way that it can reasonably be construed as "instructions"

18   from the FDIC, or as the basis of some sort of contractual relationship. The FDIC's own

19   complaint alleges that the documents "were submitted to Heritage by Bacino and Jafari in

20   connection with the transaction." (ATPC ¶ 43.) The FDIC insists in its opposition brief that

21   Heritage received and accepted the terms of the proposal letter just by disbursing $135,000

22   to the FDIC, but that gives the mistaken representation that, comparable to the facts of

23   *Money Store* and *Plaza Home*, the document was produced by the FDIC as some sort of

24   separate escrow instruction and consciously accepted as such by Heritage. (*See* Opp'n Br.

25   at 13–14.) Indeed, when the FDIC filed this case it *didn't even know* what Heritage's escrow

26   instructions were, which makes it extremely difficult to claim that a contractual relationship

27   existed between the FDIC and Heritage. (ATPC ¶¶ 20, 44.)

28          The only direct correspondence from the FDIC to Heritage that the Court can locate

in the record is the September 27, 2011 letter in which it informed Heritage that the conditions of its accepting the short sale hadn't been satisfied and that it would be returning the $135,000.  (Case No. 12-CV-1971, Castillo Decl., Ex. J.)  But that letter isn't the basis of the FDIC's claims against Heritage.  The FDIC isn't claiming in this case that when it refused the $135,000 Heritage failed to act.  It is arguing that the damage was done prior to that, when Heritage disbursed $135,000 to the FDIC, closed escrow, and Jafari's lender recorded a deed of trust on the property that conflicts with the FDIC's–all without checking with the FDIC first.  (ATPC ¶¶ 30–34.)

Because *Money Store* and *Plaza Home* don't carry the weight the FDIC needs them to, the Court turns, finally, to general principles of contract law on which the FDIC leans to argue that it stood in a contractual relationship with Heritage.  Those principles are few and undisputed.  First, a third party can enforce a contract of which it is expressly an intended beneficiary.  Cal. Civ. Code § 1559; *Cal. Emergency Physicians Med. Group v. PacifiCare of Cal.*, 111 Cal.App.4th 1127, 1138 (Cal. Ct. App. 2003).  The word "expressly" matters. A party that is only incidentally or remotely benefitted by a contract can't enforce it.  *Id.* at 1137.  Rather, it must clearly appear that the third party is a beneficiary of the contract; "expressly" means "in direct or unmistakable terms; explicitly; definitely; directly."  *Schauer v. Mandarin Gems of Cal., Inc.*, 125 Cal.App.4th 949, 958–59 (Cal. Ct. App. 2005) (citations omitted).  "It is not necessary that an express beneficiary be specifically identified in the contract; he or she may enforce it if he or she is a member of a class for whose benefit the contract was created."  *Outdoor Servs., Inc. v. Pabagold, Inc.*, 185 Cal.App.3d 676, 681 (Cal. Ct. App. 1986).

There are two "contracts" of which the FDIC claims to be an intended beneficiary. One is the release agreement/proposal letter, but as Heritage points out, the FDIC was *a party* to that, so it is not coherent to assert a breach based on being a third party beneficiary. The other document is the joint escrow instructions, including the addendum, which indicated that certain conditions had to met to the FDIC's satisfaction before it would reconvey its deed of trust for $135,000.  The FDIC seizes on the Second Restatement's definition of an

1 intended beneficiary, quoted in *Outdoor Servs.*, that "a beneficiary of a promise is an

2 intended beneficiary if recognition of a right to performance in the beneficiary is appropriate

3 to effectuate the intention of the parties and . . . the performance of the promise will satisfy

4 an obligation of the promisee to pay money to the beneficiary." *Id.* at 684.  As the FDIC sees

5 it, the statement in the addendum to the joint escrow instructions that "[t]his purchase

6 agreement is subject to the approvals of . . . the FDIC" was a promise from Bacino to Jafari

7 to obtain the FDIC's approval.  Moreover, recognizing the FDIC's right to insist on that

8 approval is necessary to effectuate the intent of Bacino to convey his home to Jafari free and

9 clear of any liens.  The Court disagrees.

10       First, the real promisor in this case, even according to the FDIC, is Bacino.  Heritage

11 may have accepted the joint escrow instructions, but it's simply inaccurate to spin this

12 acceptance as Heritage itself making a promise to Jafari, or to Bacino, to obtain the FDIC's

13 approval before disbursing $135,000 to it.  So, even if the FDIC is an intended beneficiary

14 of the Bacino-Jafari escrow, which is itself an agreement with Heritage, any breach of

15 contract claim should probably be asserted against Bacino.  Second, the FDIC identifies no

16 case in which an escrow company was found potentially liable under a third party beneficiary

17 theory  for improperly heeding the parties' own terms.  Third, the one case it does cite,

18 *Outdoor Servs.*, is easily distinguishable.  In that case, Pabagold hired a company called

19 Mediasmith to run an advertising campaign, and authorized it to enter into contracts with

20 third party advertisers.  Mediasmith then retained Outdoor Services to buy billboard space,

21 and when Pabagold failed to reimburse Mediasmith, Outdoor Services went after Pabagold

22 as a third party beneficiary of its contract with Mediasmith.  This case doesn't map onto

23 those facts at all.  For at least these reasons, the Court finds that an intended beneficiary

24 theory of liability is simply inapt in this case.

25 **V.    Conclusion**

26       For the reasons given above, Heritage's motion to dismiss the FDIC's breach of

27 fiduciary duty, negligence, and breach of contract claims is **GRANTED**.  Those claims are

28 **DISMISSED WITH PREJUDICE**.  It follows that the FDIC's claims for implied contractual

indemnity and declaratory relief also fail, and they are **DISMISSED WITH PREJUDICE**. The Court certainly understands the FDIC's frustration in this case, especially considering its allegation that First American, which is driving this litigation, has some sort of professional relationship with Heritage. But it may continue to press its claims against Bacino, and it may certainly raise all of the arguments it raises with respect to this motion in defending against Jafari's claims against it. The Court's finding here is narrow: the FDIC cannot press the asserted claims against Heritage for its handing of the Bacino-Jafari escrow.

**IT IS SO ORDERED**.

DATED: March 4, 2014

_Larry A. Burns_

**HONORABLE LARRY ALAN BURNS**
United States District Judge